**UNITED STATES ATTORNEY'S OFFICE
COMPLAINT AND/OR SEARCH WARRANT
ROUTING SLIP**

      The attached affidavit in support of a criminal complaint and/or search warrant has been reviewed for compliance with Rules 3 and 4 of the Federal Rules of Criminal Procedure

**AUSA:**     Meghan K. McGuire     **DATE:**     September 3, 2025

**PHONE:**     **(585) 399-3922 (desk), (585) 794-1776 (cell)**

**AGENT:**     **Bradford B. Price, SA, FBI**

**CELL PHONE:**     **(646) 315-2389**

**CASE NAME/NUMBER:**

**United States v. DHRUV PATEL
25-MJ-615**

**VIOLATION(S):**     Title 18, United States Code, Sections 1343 and 1349 (Wire Fraud and Conspiracy to Commit Wire Fraud), Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 1956(h) (Money Laundering and Conspiracy to Commit Money Laundering), and Title 18, United States Code, Section 371 and 2314 (Transportation of Stolen Money in Interstate Commerce and Conspiracy to Transport Stolen Money in Interstate Commerce)

**SEALED:**  **X**        **UNSEALED:**        

# CRIMINAL CASE RELATED FORM

Buffalo_Intake@nywd.uscourts.gov or Fax No. 716-551-1705  |  Rochester_Intake@nywd.uscourts.gov or Fax No. 585-613-4035

Case Number:  25-MJ-615

In Re:  United States v. DHRUV PATEL

☐ **Misdemeanor Information**
contact duty MJ for MJ case

■ **Criminal Complaint**
contact duty MJ for MJ case

☐ **Felony Information**
contact Clerk's Office for CR case

☐ **Indictment**
contact Clerk's Office for CR case

☐ **Appeal from MJ Decision**
contact Clerk's Office for misc. criminal (MR) case

☐ **Death Penalty Eligible**

☐ **Child Pornography Charges**
e.g., 18:2252,or 18:2252A

☐ **RICO Charges**
e.g. 18:1962

☐ **1326 Complaint**

☐ **Multi-defendant case with** _____ (# of) defendants

**Victim Case?  (Must Check One Box)**

■ YES (Copy to VW Coordinator)          ☐ No

■ This criminal case has no relationship to any pending case and the defendant has not appeared in Federal Court.

☐ This criminal case involves a defendant who is currently a defendant in magistrate case number (MJ)_____ before United States Magistrate Judge:

☐ Holland          ☐ McCarthy          ☐ Pedersen          ☐ Roemer          ☐ Schroeder

☐ This criminal case is related to criminal case number _____ (CR or MR), or to civil forfeiture case number _____, or the defendant has appeared on an unrelated matter before Judge:

☐ Sinatra          ☐ Vacca          ☐ Vilardo          ☐ Wolford
☐ Arcara          ☐ Geraci          ☐ Larimer          ☐ Siragusa          ☐ Skretny

☐ Other: _____

Date:  9/3/25

Meghan K. McGuire
Assistant U.S. Attorney
(USAO Fax No. 716-551-3052 or 585-399-3936)

Defense Counsel:

Name: _____

Address: _____

Phone: _____

Designation:          ☐ CJA          ☐ Retained          ☐ Public Defender

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA

       -v-                                       25-MJ-615

DHRUV PATEL,

                   Defendant.

_____

## GOVERNMENT'S MOTION TO SEAL

**THE UNITED STATES OF AMERICA**, by and through its attorney, Michael DiGiacomo, United States Attorney for the Western District of New York, and Meghan K. McGuire, Assistant United States Attorney, of counsel, hereby moves the Court for an Order permitting the filing of this motion, the above-referenced criminal complaint and associated documents, including the affidavit, under seal.   The government requests the Court seal the documents for 60 days due to the sensitive law enforcement information therein.

    Dated:   Rochester, New York, September 3, 2025

                                       MICHAEL DiGIACOMO
                                       United States Attorney
                                       Western District of New York

                                       s/*Meghan K. McGuire*
                 BY:   MEGHAN K. McGUIRE
                           Assistant U.S. Attorney
                           100 State Street, Suite 500
                           Rochester, New York 14614
                           585-399-3922
                           Meghan.McGuire@usdoj.gov

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA

     -v-                                      25-MJ-615

DHRUV PATEL,

               Defendant.

_____

### ORDER GRANTING GOVERNMENT'S MOTION TO SEAL

Upon the motion of the United States of America, by and through its attorney, Michael DiGiacomo, United States Attorney for the Western District of New York, and Meghan K. McGuire, Assistant United States Attorney, of counsel, for an Order permitting the filing of a criminal complaint and associated documents under seal, and after due consideration,

IT IS HEREBY ORDERED, that the criminal complaint and associated documents of the United States is hereby permitted to be filed under seal for 60 days.

DATED:     Rochester, New York, September 3, 2025.

_____
HON. MARK W. PEDERSEN
United States Magistrate Judge

AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
Western District of New York

| | |
|---|---|
| United States of America<br>v.<br>DHRUV PATEL<br><br>_____<br>*Defendant(s)* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No.

    25-MJ- 615

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____4/2024 through 11/2024_____ in the county of _____Monroe_____ in the _____Western_____ District of _____NY, and elsewhere_____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 USC 1343 and 1349<br>18 USC 1956(a)(1)(B)(i) and 1956<br>(h)<br>18 USC 371 and 2314 | Wire Fraud and Conspiracy to Commit Wire Fraud<br>Money Laundering and Conspiracy to Commit Money Laundering<br>Transportation of Stolen Money in Interstate Commerce and Conspiracy to<br>Transport Stolen Money in Interstate Commerce |

This criminal complaint is based on these facts:

See the Affidavit of Bradford B. Price, Special Agent, Federal Bureau of Investigation

☑ Continued on the attached sheet.

*Bradford Price*
_____
*Complainant's signature*

Bradford B. Price, SA, FBI
_____
*Printed name and title*

submitted electronically by email in .pdf format. Oath administered, and contents and signature attested to me as true and accurate telephonically pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3).

Date:    September 3, 2025

_____
*Judge's signature*

City and state:        Rochester, NY            HON. MARK W. PEDERSEN, US Magistrate Judge
_____
*Printed name and title*

| Print | Save As... | Attach | Reset |
|---|---|---|---|

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

STATE OF NEW YORK    )
COUNTY OF MONROE    ) ss:
CITY OF ROCHESTER    )

I, BRADFORD BARRETT PRICE, being duly sworn, depose and state:

## INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been since 2004.  I am currently assigned to the Rochester, New York, Resident Agency.  As a special agent of the FBI, I am an investigative or law enforcement officer of the United States, authorized to investigate violations of United States laws and to execute warrants issued under the authority of the United States.  As an investigative or law enforcement officer of the United States, I am also authorized to conduct investigations of and to make arrests for violations of federal criminal statutes.

2.      This affidavit is submitted in support of a criminal complaint charging DHRUV PATEL with violations of Title 18, United States Code, Sections 1343 and 1349 (Wire Fraud and Conspiracy to Commit Wire Fraud), Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 1956(h) (Money Laundering and Conspiracy to Commit Money Laundering), and Title 18, United States Code, Section 371 and 2314 (Transportation of Stolen Money in Interstate Commerce and Conspiracy to Transport Stolen Money in Interstate Commerce) (hereinafter, collectively the "TARGET OFFENSES").

3.      This affidavit is based on my investigation and on information provided to me by members of the law enforcement community.

1

4.     Because this affidavit is being submitted for the limited purpose of securing a criminal complaint, I have not included each and every fact known to me concerning the investigation.  Instead, I have set forth only the facts which I believe are sufficient to establish probable cause to believe that PATEL committed the TARGET OFFENSES.

## PROBABLE CAUSE

### *Background Regarding the Elder Fraud Scheme*

5.     In approximately April 2024, FBI agents became aware of an internet and telephone based fraud scheme that targeted elderly victims in the Western District of New York and elsewhere.

6.     The perpetrators of this scheme fraudulently represented to their victims that their (the victims') bank accounts and/or funds were threatened or compromised in some manner.  The perpetrators then told the victims that they needed to send their money (in the form of wire, cash, cryptocurrency, and/or gold) to "law enforcement" to secure the money and aid law enforcement in identifying and arresting the criminals who had compromised their accounts and funds.

7.     When the scheme involved either cash or gold, the perpetrators arranged for "money mules" to pick up the cash and gold from the victims and then deliver it to another member of the conspiracy.

8.     As is set forth in further detail below, PATEL is a money mule.  On at least five occasions, he either personally collected or conspired to collect cash and gold from elderly victims in New York, Pennsylvania, Colorado, and Connecticut.  He then either personally

2

transported that money across state lines or conspired to have the money transported across state lines.

### Victim 1

9. Victim 1 is a 71-year-old resident of the Northen District of New York.

10. On or about May 8, 2024, Victim-1 called an individual whom she believed was an Etsy employee.

11. The "Etsy employee" told Victim 1 that they had records of her making multiple purchases that Victim 1 had not, in fact, made. The "Etsy employee" then transferred Victim 1 to an individual who claimed to be "PATRICK MARSHALL" of the U.S. Federal Trade Commission.

12. "PATRICK" told Victim 1 that she was the victim of identity theft.

13. "PATRICK" told her that she needed to withdraw all the money from her savings account so that "Patrick's co-worker" could pick it up for safekeeping.

14. Initially, Victim 1 complied with "PATRICK's" request and withdrew some of her savings. However, after consulting with her relatives, Victim 1 became suspicious of "PATRICK" and contacted the Colonie, NY Police Department ("Colonie PD").

15. With Victim 1's help, Colonie PD set up a sting operation. Colonie PD advised Victim 1 to arrange with "PATRICK" for $48,000 cash to be picked up on or about May 13, 2024.

3

16.    On or about May 13, 2024, Victim 1 received a call from "PATRICK" asking about the $48,000. Victim 1 confirmed that it was ready to be picked up. "PATRICK" instructed Victim 1 to package the money. He then confirmed that a driver was on the way to collect the money. "PATRICK" said the driver would give the password "0388" to Victim 1 as a "security measure."

17.    Shortly after this call, officers who were in the immediate vicinity observed a gray Dodge Charger with Texas license plate SFJ-6056 stop in front of Victim 1's house.

18.    PATEL was the driver and sole occupant of the Charger.

19.    Colonie PD arrested PATEL and seized two iPhones and a black tablet from the front seat of the Charger. The tablet was unlocked and opened to a "WhatsApp" text thread that had a picture of Victim 1's house and a text that read "Password 0388."

**Colonie PD Interviews PATEL**

20.    After his arrest, PATEL was taken to a Colonie PD station. There, he was advised of his *Miranda* rights, indicated he understood those rights, and agreed to speak with law enforcement.

21.    During this interview, PATEL admitted that he drove to VICTIM 1's residence to pick up the $48,000 in cash, and that he had conspired with others to do so, naming some of these co-conspirators.

4

22.     PATEL admitted he "did think that [he] was doing wrong," and "knew it was strange."  PATEL claimed that he had "done this like three or four times."  PATEL identified two specific instances: one time in Maryland and another time in Jackson, New Jersey.

23.     PATEL said that he would drop off the money to someone in Jersey City, New Jersey.

24.     PATEL said that, in return for picking up and dropping off these "parcels," he would have approximately $3,000 to $4,000 of his gambling debt forgiven.

25.     PATEL consented to have the law enforcement officers look through his tablet in his presence but would not let them look at his cell phones.

26.     In reviewing the tablet, the officers observed a particular address in Connecticut (hereinafter "Address 1") in PATEL's WhatsApp conversations.  PATEL claimed that this was the address where he was supposed to deliver Victim 1's cash.

27.     Later that evening, PATEL was arraigned and charged by the State of New York with Grand Larceny in the 3rd degree and Scheme to Defraud in the 2nd degree.  PATEL ultimately pled guilty, and on November 25, 2024, he was sentenced to five years' probation.

28.     During this investigation, Colonie PD obtained a search warrant for PATEL's iPhones and tablet.

**Victim 2**

29.     Victim 2 is a 71-year-old resident of Connecticut.

5

30.    Similar to Victim 1, in early April 2024, Victim 2 placed a call to what she believed was the online retailer Etsy.

31.    Victim 2's call was ultimately routed to individuals who claimed to be "HARVEY SMITH" and "IAN CORENZO" from the U.S. Federal Trade Commission.

32.    "SMITH" and "CORENZO" first accused Victim 2 of money laundering. Then, they told her that her bank accounts had been compromised and that she needed to withdraw all the money in her savings and give it to their "coworkers" for safekeeping.

33.    Victim 2 complied and withdrew funds from her accounts.

34.    Over the course of seven separate pick-ups, between on or about April 11, 2024, and on or about June 19, 2024, Victim 2 gave approximately $1.1 million to individuals she believed were "SMITH and CORENZO's coworkers."

35.    Sometimes Victim 2 gave the "coworkers" cash. Other times, she was directed to convert the cash into gold bars to give to the "coworkers."

36.    For example, on or about May 8, 2024, Victim 2 converted approximately $316,356 into four one-kilogram gold bars, and placed the gold bars into the vehicle of a "coworker" who arrived at her residence.

37.    When "SMITH" and "CORENZO" coordinated these pickups, they had Victim 2 confirm her full name, address, and what she was wearing. On May 8, 2024, Victim 2 was wearing a light green shirt and black shorts.

6

38.    While searching PATEL's tablet, Colonie PD found the following evidence that PATEL was the money mule who collected $316,356 worth of gold bars from Victim 2 on May 8, 2024:

    a.  In a WhatsApp conversation, dated May 8, 2024, PATEL received a message with Address 1 (which is Victim 2's address) and replied "Ok."

    b.  Later, at approximately 10:16 am, PATEL sent a message, "On the way."

    c.  PATEL sent screenshots of one of his phones running a navigation app showing a destination zip code that matched Address 1's zip code.

    d.  At approximately 1:51, PATEL received a message that said, "CUS NAME: [VICTIM 2's name]; M/F:- Female; Age :- 70; Car colour :-Honda Accord, Gray; Clothes :- Light green t-shirt and black short."

    e.  At approximately 2:33, PATEL sent a photo of what appeared to be four one-kilogram gold bars on the center console of a vehicle.

### Victim 3

39.    Victim 3 is a 77-year-old resident of Pennsylvania.

40.    In early May 2024, Victim 3 placed a call to what she believed was an AppleCare service number that she found after searching on Google.

41.    When Victim 3 called the "AppleCare service number," an "AppleCare service representative" told Victim 3 that there was a problem with her (Victim 3's) Wells Fargo bank account. The "AppleCare service representative" transferred Victim 3's call to another individual who claimed to be "JEFF HOSKINS" from Wells Fargo's Bank Fraud Unit.

42.    "HOSKINS" told Victim 3 that her bank accounts had been compromised by a "scammer" and that she needed to withdraw all the money in her savings and either send it to him electronically or hand deliver it to "FBI agents" for safekeeping.

7

43.     Victim 3 complied and withdrew funds from her accounts.

44.     Between on or about May 10, 2024, and on or about August 22, 2024, Victim 3 gave approximately $511,546 to "HOSKINS" and "FBI agents" through a series of in-person exchanges and virtual currency transactions.

45.     During the in-person exchanges, Victim 3 typically gave the "FBI agents" cash. But, on at least one occasion, she was directed to convert the cash into gold bars to give them to the "FBI agents."

46.     Specifically, on or about May 10, 2024, "HOSKINS" directed Victim 3 to withdraw approximately $134,400 cash from her bank account, package it in a box, write her full name on two corners of the box, and then turn the box over to an "FBI agent" who came to Victim 3's residence.

47.     When "HOSKINS" coordinated these pickups, he had Victim 3 confirm her full name, address, date of birth, age, and what she was wearing. In addition, "HOSKINS" supplied her with a "password" for "security purposes."

48.     While searching PATEL's Apple iPhone 15, Colonie PD found the following evidence that PATEL was the money mule who posed as an FBI agent and collected $134,400 cash from Victim 3 on or about May 10, 2024:

      a. In a WhatsApp conversation, dated May 10, 2024, at approximately 10:59 AM, PATEL received a message that said:

            NAME:- [Victim 3's name]
             Address:- [Victim 3's home address]
             Dob :- [Victim 3's date of birth]
             Age:- [Victim 3's age];

8

>Hair colour :- red;
>M/F:- female;
>Password :- lily;
>What wear today :- black top and blue jeans

b.  At approximately 11:18 AM, PATEL received another message from the same sender that said, "Amount $34K." PATEL replied, "OK."

c.  Later that day, at approximately 11:47 AM, PATEL sent screenshots of one of his phones running a navigation app showing him in the vicinity of his hometown of Franklin Park, NJ.

d.  At approximately 12:39 PM, PATEL sent a screenshot of one of his phones running a navigation app showing him in the vicinity of Victim 3's home address.

e.  One minute later, PATEL received a message that repeated the information in Paragraph 48(a), above, but changed the "password" to "daisy flower." He then received a second message that updated the clothing description to include "Winter coat black black [sic] sketchers shoes."

f.  At approximately 12:41 PM, PATEL received the following photos of a taped, cardboard box with the name of Victim 3 on the top left and bottom right corners, and of neatly displayed banded stacks of $100 and $50 bills:

 

9

**Conversations between Confidential Source and PATEL**

49.     FBI Milwaukie engaged a confidential source (hereinafter "CS-1") who participated in a proffer session as part of another financial fraud investigation.  During this proffer, CS-1 gave the FBI information about other organized crimes occurring nationwide.

50.     CS-1 is seeking prosecutorial leniency in exchange for his/her cooperation. The government has not made any promises to CS-1 and has not compensated CS-1 for the information the s/he has provided.

51.     According to a law enforcement database, CS-1's criminal history includes the following: (1) a January 2015 arrest for false swearing (non-criminal) (WI Statue § 946.32), which was dismissed; (2) a March 2015 arrest for possession of child pornography (WI Statue § 948.12), which was also dismissed; and (3) a February 2018 felony conviction for making threats to communicate derogatory information (WI Statue § 943.31).  CS-1 served a sentence of probation for this conviction.

52.     CS-1 met PATEL through a mutual acquaintance.  PATEL was looking for people to collect cash and gold for him.  PATEL asked CS-1 for his/her number and agreed to let CS-1 know about job opportunities.

53.     Starting on or about June 1, 2024, CS-1 began having video phone calls with PATEL.  CS-1 recorded these video calls, and they were translated from Hindi to English.

54.     In these phone calls, PATEL told CS-1 that he was a courier and conducted over sixty pickups in six years.  PATEL admitted that he was arrested for conducting pickups

10

in the past, but said that despite his arrests, the courier organization still trusted him to do pickup jobs. In fact, PATEL said that the courier organization paid for PATEL's attorneys.

55. PATEL said that he also acted as a middleman, arranging for others to pick up gold and cash at his direction. In that regard, PATEL offered CS-1 courier jobs picking up cash and/or gold from elderly individuals. PATEL offered CS-1 2% of any pickup as compensation. PATEL also said that he would pay for CS-1's flight, hotel, and rental car.

56. For example, in or around May 2024, PATEL offered CS-1 a pickup job in California. The package was estimated to be $2.4 million in gold. If CS-1 had accepted the assignment, he/she would have received approximately $40,000 as payment.

57. During one such conversation, on or about June 2, 2024, PATEL and another co-conspirator (hereinafter "Subject 1") explained to CS-1 that they "provide a password to [the driver] once he gets [to the pick-up location]," and that "once [he] has their package or money in his possession, he is responsible for paying them back in the event that he is arrested."

58. In another phone call, later the same day, between PATEL and CS-1, they discussed getting an additional phone for their "business" communications and PATEL advised CS-1 not to get a phone from "T-Mobile because he would have to give his name" and instead to "get a used phone from Best Buy…without giving out any personal details." PATEL also explained to CS-1 his security "system" to avoid getting caught, involving doing surveillance on the pick-up location prior to picking up the package and finding "alternate routes" to and from the location. PATEL told CS-1 that "he had not got caught for a 17-lakh [translated - $1.7 million USD] job but got caught for $40,000" because he "forgot to surveil

11

the pick-up spot." When discussing how much CS-1 could make in the "business," PATEL told CS-1 that he had once "shown 6 kilo of the gold [approximately $650,000] to [a mutual associate]," and that on the day after, PATEL would be "leaving for California…for a pickup of 11 lakhs [translated - $1.1 million]."

59.    On or about June 22, 2024, PATEL told CS-1 about another courier who was arrested recently while attempting a similar pick-up but was released without being charged. PATEL explained that the "reason is that the courier does nothing wrong.  S/he is simply being sent to a location to do a pickup." PATEL added that the "courier does not know the person who is dropping the package in the courier's vehicle, and that the scamming is being done by someone else" and that if a "courier is stopped [by police], all he or she would have to say is that a friend asked for a pickup/drop-off as a favor and he or she has no idea what the package contains." PATEL continued, "the courier is not the one committing the crime but simply involved in the crime that took place." PATEL said that "when he [Patel] was arrested, he told the police the same thing - that he was picking up packages for friends and had no idea what was in them." PATEL also explained a "rule" for how to pick up these "packages"; he required the victim to place the package into his vehicle through the rear window because "this way, no matter who is watching, the courier is not considered committing a crime because he or she is not handling the package at all," adding that "sometimes some older folks might try to hand a package to the courier but the courier must tell them to drop the package in the vehicle. By doing so, if the courier is stopped and questioned about the package, he or she can claim complete innocence as they have neither met nor know the customer, nor have they handled the package or know what is in it."

12

**Victim 4**

60.     Victim 4 is 70 years old and a resident of the Western District of New York.

61.     On or about June 14, 2024, Victim 4 noticed an incorrect charge for $150 from what appeared to be Venmo on her online credit card statement, along with a phone number to call to dispute the charge.

62.     Upon calling this number, she was told by a supposed "Venmo employee" that she would be reimbursed.  The "Venmo employee" then claimed that he/she had accidentally reimbursed Victim 4 $15,000.  The "Venmo employee" told Victim 4 to withdraw the "extra" $14,600 and give it to two men who would come to her house, which she did.

63.     Afterwards, on or about June 20, 2024, Victim 4 was contacted by someone who claimed to be "JAMIE MORRIS" from the US Federal Trade Commission.  "JAMIE" told Victim 4 that all her bank accounts were tied to drug and child pornography trafficking, and that Victim 4 had to withdraw all her funds (approximately $587,000), convert them to gold, and give the gold to a courier for "safeguarding" in a "security locker."

64.     On or about June 26, 2024, the owner of a jewelry and coin exchange in Rochester, NY, contacted me to report that Victim 4 planned to purchase approximately $587,000 worth of gold from his store that day.

65.     I met Victim 4 at the jewelry and coin exchange, identified myself as an FBI agent, and interviewed her regarding her intended purchase.

66.     Victim 4 told me about "JAMIE" and, after she realized that she was being defrauded, agreed to assist law enforcement in a sting operation.

67.     On or about July 1, 2024, Victim 4 sent "JAMIE" photographs of what appeared to be gold bars.  After receiving the photographs, "JAMIE" contacted Victim 4, instructed her to put the gold bars in a box and seal it, and stated that somebody would be coming by her residence to pick the box up.  Later that evening, "JAMIE" told Victim 4 that a car would be coming to her home to get the box of gold bars. "JAMIE" then instructed Victim 4 to put the box of gold bars on the hood of her vehicle parked in her driveway, and the driver would pick it up when he arrived. Victim 4 complied with these directions.

68.     Shortly after this, law enforcement officers observed a grey Dodge Charger briefly stop in front of Victim 4's home, then drive away.  The Dodge Charger then returned a short time later and parked.  PATEL exited the Charger, walked to Victim 4's vehicle, grabbed the box from the hood, and walked back towards his vehicle.  Officers then apprehended and detained PATEL.

**FBI Interviews PATEL**

69.     After he was detained, PATEL was advised of his *Miranda* rights, indicated he understood those rights, and agreed to waive them and speak with law enforcement.  PATEL also gave consent for law enforcement to seize and search a Motorola phone he had on him when he was detained.

70.     PATEL was taken to a nearby police station, where he was interviewed. During the interview, PATEL admitted that he drove to Victim 4's residence to pick up the

14

package, and that he had conspired with others to do so.  PATEL named some of the same co-conspirators that he had identified when he was interviewed by Colonie PD.

71.     PATEL claimed he had picked up a package only once before.

72.     PATEL said that his co-conspirators instructed him to drop off the package with someone in Jersey City, New Jersey, and that, in return for picking up and dropping off this package, he would have approximately $3,000 to $4,000 of his gambling debt forgiven.

73.     PATEL also admitted that, after his arrest in Colonie, New York, he was aware that he was part of a fraudulent scheme.  But PATEL claimed that he did not believe Victim 4's package pick up was part of that fraudulent scheme.

**Victim 5**

74.     Victim 5 is 75 years old and a resident of Denver, Colorado.

75.     On or about April 17, 2024, Victim 5 received an "alert" on her laptop that purported to be from "Microsoft."

76.     The "Microsoft alert" said that Victim 5's laptop had a virus and directed her to call a specific number for assistance.

77.     When Victim 5 called this number, she spoke with someone purporting to be a "Microsoft employee."

15

78.     The "Microsoft employee" transferred Victim 5 to "JAMES CARTER" and "ALEXANDER PARKER," who claimed to be employees of the US Federal Trade Commission.

79.     "CARTER" and "PARKER" told Victim 5 that "scammers" could try to break into her bank accounts and steal her money.  They directed Victim 5 to withdraw all her funds, convert them to gold, and then give the gold to couriers for "safeguarding" until it could be returned to her.

80.     Between on or about April 29, 2024, and on or about December 5, 2024, Victim 5 made multiple withdrawals of her funds, converted them to gold bars, and then met a series of couriers at either her home or another predetermined location to turn over the gold bars for "safekeeping."

81.     In total, Victim 5 gave approximately $2.6 million to these couriers at "CARTER" and "PARKER's" direction.

82.     According to Victim 5, during at least one of these arranged pick-ups, Victim 5 was wearing a red V-neck top, blue jeans, silver hoop earrings, and sunglasses.

83.     Victim 5 owns an antique Oldsmobile vehicle with a Colorado license plate, which she keeps in her garage.

84.     While searching PATEL's Motorola phone, the FBI found the following evidence that PATEL was conspiring with the courier who collected gold bars from Victim 5 on or about June 27, 2024:

16

a. A screenshot of a flight itinerary for a co-conspirator (hereinafter "SUBJECT 2") for a flight from Dallas, TX to Denver, CO. According to the itinerary, the flight was scheduled to arrive in Denver, CO, on June 27, 2024, at 8:10 AM.

b. A screenshot of a car rental reservation in Colorado for June 27, 2024, at 8:30 AM.

c. A WhatsApp conversation, dated June 27, 2024, at 4:24 pm, in which SUBJECT 1[1] sent PATEL the following message: "Red V-neck top, blue jeans, silver hoop earrings and sunglasses." SUBJECT 1 also sent PATEL an image of an antique Oldsmobile parked in a garage with a Colorado license plate that matched Victim 5's license plate. At 4:27 pm, SUBJECT 1 sent PATEL a video of a dark-skinned male opening a small white box containing gold bars.

d. A screenshot of a flight itinerary for SUBJECT 2 for a flight from Denver, CO, to Dallas, TX, on June 27, 2024, at 6:20 pm.

e. Indications of calls and texts between PATEL and SUBJECT 2 *via* WhatsApp on June 25 and 26, and July 1, 2024.

85.    Based on my training and experience and knowledge of this investigation, I respectfully submit that the above-referenced evidence from PATEL's Motorola phone demonstrates that PATEL was acting as an intermediary between SUBJECT 1 and SUBJECT 2, coordinating SUBJECT 2's pick up of gold from Victim 5 on June 27, 2024, and then coordinating SUBJECT 2's subsequent transportation of that gold across state lines, from Colorado to Texas.

**Additional Conversations between PATEL and the Confidential Source**

86.    After PATEL was detained and interviewed on July 1, 2024, CS-1 had another call with him, on or about July 31, 2024.

---

[1] The sender of this message was identified as SUBJECT 1 because he had the same name and WhatsApp number as the individual who spoke with CS-1 during the conversation described in Paragraph 49, above.

17

87.     During this call, PATEL said that he was trying to remain "underground" and stay out of trouble with law enforcement.  However, he admitted that he was still connected with the gold courier organization and was now working as an intermediary for other couriers, arranging for them to do the package pickups and splitting the "commission" money after completing the delivery.

88.     PATEL said that he maintained a book of all the pickups he was responsible for.

89.     PATEL told CS-1 about a pick-up that PATEL was coordinating that day, explaining that, "for his job of 4.5 Kg gold today, his boy will earn $8,000, plus he will have to pay him the flight and rental car expenses."  PATEL said that he (PATEL) would earn "$4,000 only," as he "gets 4% commission in the business."

90.      PATEL then sent CS-1 pictures of the gold bars as proof:



91.     Later in the same conversation, PATEL told CS-1 that, if CS-1 wanted to be a courier and do pickups, that he would not be "the scammer - it is they [PATEL's higher level co-conspirators] who are."  PATEL then said that his co-conspirators were "making a fool of the white guys."

92.     During the week of August 5, 2024, PATEL offered CS-1 a job picking up gold. However, PATEL cancelled the pickup job because the victim's jewelry/bullion store was unwilling to sell the gold to the victim.  PATEL then offered CS-1 a second job, but cancelled that job too because the victim's bank was unwilling to wire funds to the victim's jewelry/bullion store.  PATEL then added a third person to the call, and they discussed pickup jobs in San Diego, California, Houston, Texas, and Tampa, Florida.

19

93.     On or about August 6, 2024, PATEL advised CS-1 that he was on his way to pick up five kilograms of gold from a victim located in Lackawaxen, Pennsylvania.

94.     During the week of August 12, 2024, PATEL sent CS-1 a picture of himself in a car holding a large stack of cash that he had recently picked up from a victim, shown below:



95.     In a later conversation with CS-1, on or about October 17, 2024, PATEL again discussed hiring other couriers to make pickups for him.  PATEL said that he had "13 people that [were] working for him," and that since he started doing this work, he earned more money than he "earned in his 21 years being in America."  Specifically, he claimed that he earned "about $80,000 to $90,000" in the past "eight months."

20

96. That day, Dhruv claimed that he had just picked up $40,000 in cash from a victim and was on his way to pick up another $40,000 from a second victim in Edison, New Jersey.

97.    PATEL sent CS-1 pictures of himself holding the cash:



98.     In these pictures, PATEL's face and tattoos are visible.  The tattoos match the tattoos that Colonie PD officers observed on PATEL when he was arrested.

## MONEY LAUNDERING

99.     Wells Fargo Bank records show a bank account ending in -4143 with PATEL's name, social security number, and date of birth listed on the signature card. The account was opened on or about May 1, 2017.

100.     After PATEL collected $316,356 of wire fraud proceeds from Victim 2, beginning on or about April 24, 2024, through on or about November 19, 2024, PATEL made the following cash deposits into the Wells Fargo Account -4143:

| | | |
|---|---|---|
| 4/24/2024 | ATM Cash Deposit | $ 1,000.00 |
| 4/26/2024 | ATM Cash Deposit | $ 950.00 |
| 4/29/2024 | ATM Cash Deposit | $ 3,000.00 |
| 4/26/2024 | ATM Cash Deposit | $ 2,000.00 |
| 4/29/2024 | ATM Cash Deposit | $ 2,400.00 |
| 4/29/2024 | ATM Cash Deposit | $ 2,500.00 |
| 4/29/2024 | ATM Cash Deposit | $ 1,500.00 |
| 4/29/2024 | ATM Cash Deposit | $ 1,400.00 |
| 4/29/2024 | ATM Cash Deposit | $ 1,000.00 |
| 4/29/2024 | ATM Cash Deposit | $ 1,000.00 |
| 4/29/2024 | ATM Cash Deposit | $ 2,900.00 |
| 4/29/2024 | ATM Cash Deposit | $ 1,900.00 |
| 4/29/2024 | ATM Cash Deposit | $ 1,300.00 |
| 4/29/2024 | ATM Cash Deposit | $ 3,000.00 |
| 5/2/2024 | In Branch Deposit | $ 1,460.00 |
| 5/13/2024 | ATM Cash Deposit | $ 1,650.00 |
| 5/16/2024 | In Branch Deposit | $ 1,400.00 |
| 5/20/2024 | In Branch Deposit | $ 1,000.00 |
| 5/30/2024 | In Branch Deposit | $ 1,100.00 |
| 6/7/2024 | In Branch Deposit | $ 500.00 |
| 6/14/2024 | ATM Cash Deposit | $ 1,050.00 |

| 6/20/2024 | ATM Cash Deposit | $ 1,800.00 |
|---|---|---|
| 6/25/2024 | In Branch Deposit | $ 2,300.00 |
| 7/8/2024 | ATM Cash Deposit | $ 1,400.00 |
| 7/19/2024 | ATM Cash Deposit | $ 3,300.00 |
| 8/28/2024 | ATM Cash Deposit | $ 1,200.00 |
| 9/23/2024 | In Branch Deposit | $ 2,000.00 |
| 9/27/2024 | In Branch Deposit | $ 500.00 |
| 10/4/2024 | In Branch Deposit | $ 2,000.00 |
| 11/19/2024 | ATM Cash Deposit | $ 1,000.00 |
| | **TOTAL** | **$ 49,010.00** |

101.    PATEL subsequently laundered the fraudulent proceeds by, among other things, withdrawing approximately $19,300 in cash, transferring funds to a Draft Kings Account, sending payments *via* Zelle, and making multiple purchases at a jewelry store in New Jersey.

24

## CONCLUSION

102.    Based on the foregoing, I respectfully submit that there is probable cause to believe that PATEL committed the TARGET OFFENSES.

Bradford Price
Special Agent
Federal Bureau of Investigation

Affidavit submitted electronically by email in .pdf format.   Oath administered and contents and signature attested to me and before me as true and accurate telephonically pursuant to Fed. R. Crim. P. 4.1 and 4(d) on this 3rd day of September 2025.

HON. MARK W. PEDERSEN
UNITED STATES MAGISTRATE JUDGE

25

AO 442 (Rev. 11/11) Arrest Warrant

# UNITED STATES DISTRICT COURT
### for the
Western District of New York

| | |
|---|---|
| United States of America<br>v.<br>DHRUV PATEL<br><br><br><br>_____<br>*Defendant* | )<br>)<br>)  Case No.   25-MJ-615<br>)<br>)<br>)<br>) |

## ARREST WARRANT

To:    Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay
*(name of person to be arrested)*    DHRUV PATEL                                                                    ,
who is accused of an offense or violation based on the following document filed with the court:

❑ Indictment     ❑ Superseding Indictment     ❑ Information     ❑ Superseding Information     ❑ Complaint
❑ Probation Violation Petition     ☑ Supervised Release Violation Petition     ❑ Violation Notice     ❑ Order of the Court

This offense is briefly described as follows:

There is probable cause to believe that DHRUV PATEL violated Title 18, United States Code, Sections 1343 and 1349 (Wire Fraud and Conspiracy to Commit Wire Fraud), Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 1956(h) (Money Laundering and Conspiracy to Commit Money Laundering), and Title 18, United States Code, Section 371 and 2314 (Transportation of Stolen Money in Interstate Commerce and Conspiracy to Transport Stolen Money in Interstate Commerce)

Date:   September 3, 2025                                    _____
                                                                          *Issuing officer's signature*

City and state:     Rochester, NY                           HON. MARK W. PEDERSEN, US Magistrate Judge
                                                                          *Printed name and title*

---

### Return

This warrant was received on *(date)* _____ , and the person was arrested on *(date)* _____
at *(city and state)* _____ .

Date: _____                                      _____
                                                                          *Arresting officer's signature*

                                                                          _____
                                                                          *Printed name and title*

AO 442  (Rev. 11/11)  Arrest Warrant (Page 2)

**This second page contains personal identifiers provided for law-enforcement use only and therefore should not be filed in court with the executed warrant unless under seal.**

*(Not for Public Disclosure)*

Name of defendant/offender:    DHRUV PATEL

Known aliases:    Dhrumil Patel

Last known residence:    64 Amethyst Way, Franklin Park, NJ 08823

Prior addresses to which defendant/offender may still have ties:

Last known employment:    Dunkin Donuts (unknown location)

Last known telephone numbers:    732-322-1016

Place of birth:    India

Date of birth:    04/06/1991

Social Security number:    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

Height:    5'6"            Weight:    170 lbs

Sex:    male            Race:    Indian

Hair:    Black            Eyes:    Black

Scars, tattoos, other distinguishing marks:    tattoos on left side chest and right forearm

History of violence, weapons, drug use:

Known family, friends, and other associates *(name, relation, address, phone number)*:    lives at address with Praful (father), Sazojben (mother), and Urvashiben (wife) Patel

FBI number:    434103JD8

Complete description of auto:

Investigative agency and address:    FBI Rochester, 1200 Scottsville Road, Rochester NY 14624

Name and telephone numbers (office and cell) of pretrial services or probation officer *(if applicable)*:

Date of last contact with pretrial services or probation officer *(if applicable)*:    Laura Omelia, NY state probation 518-487-5236

| Print | Save As... | Reset |